Luis JARDINES–GUERRA, [A74–047–764] Petitioner,

v.

John ASHCROFT, United States Attorney General; Immigration and Naturalization Service; and Adele Fasano, INS District Director for the San Diego District, Respondents.

No. 02CV1718BTM(JFS).

United States District Court, S.D. California.

March 17, 2003.

Jason I. Ser, Federal Defenders of San Diego, San Diego, CA, for Petitioner.

Samuel W. Bettwy, Robert H. Plaxico, Assistant U.S. Attorneys, San Diego, CA, for Respondents.

ORDER GRANTING IN PART AND DENYING IN PART PETITION FOR WRIT OF HABEAS CORPUS

MOSKOWITZ, District Judge.

On August 27, 2002, Petitioner filed a Petition for writ of habeas corpus pursuant to 28 U.S.C. § 2241. Petitioner is an inadmissible alien under a final removal order and is currently being detained by the Immigration and Naturalization Service ("INS"). Petitioner contends that since there is no significant likelihood that the INS will be able to effect his removal to his native country, the INS lacks statutory power to continue his detention indefinitely pending his deportation.

For the reasons stated below, the Court GRANTS in part and DENIES in part the Petition for writ of habeas corpus.

## I. BACKGROUND

Petitioner is a 42–year old native of Cuba who arrived in the United States via Miami, Florida on August 23, 1995. The INS took him into custody upon his arrival but released him into the United States as a public interest parolee. *See,* 8 U.S.C. § 1182(d)(5)(stating that Attorney General has discretion to parole an alien into the United States temporarily, but the paroled alien's physical presence in the United States does not constitute an entry or an admission).

On May 27, 2001, Petitioner was sentenced to two years of incarceration in state prison for violating a restraining order and making terrorist threats against an individual. On or about May 29, 2001, the INS took him into custody and on August 1, 2001, an immigration judge ordered Petitioner's removal to Cuba. As Petitioner waived his right to appeal this decision, his removal order became final on August 1, 2001. 8 C.F.R. § 241.1(b). Pursuant to 8 U.S.C. § 1231(a)(2), the INS

placed Petitioner in post-order detention pending his removal. Petitioner's removal was not effected within the 90–day removal period required by 8 U.S.C. § 1231(a)(1). The INS, however, continued to detain Petitioner under authority of § 1231(a)(6), which allows for detention beyond 90 days of inadmissible aliens who the Attorney General determines "to be a risk to the community." According to the INS, Petitioner is a risk to the community because of his violent disposition and his mental illness.

The INS has been unable to obtain a travel document from the Cuban government for Petitioner's removal to Cuba. Because his removal to Cuba is not "significantly likely" in the reasonably foreseeable future, Petitioner contends that the INS lacks statutory authority to continue to detain him.

## II. DISCUSSION

### 1. *Applicability of Xi*

In *Zadvydas v. Davis,* 533 U.S. 678, 121 S.Ct. 2491, 150 L.Ed.2d 653 (2001), the Supreme Court held that the Attorney General's authority under § 1231(a)(6) to detain an admitted alien beyond the statutory removal period must be construed as being limited to a period of time reasonably necessary to remove the alien. The Court held that six months was a presumptively reasonable period, but after that if "the alien provides good reason to believe that there is no significant likelihood of removal in the reasonably foreseeable future, the Government must respond with evidence to rebut that showing" or release the alien pending deportation. *Id.* at 701, 121 S.Ct. 2491.

Rather than challenging Petitioner's contention that there is not a significant

likelihood that he will be removed to Cuba, Respondent contends that *Zadvydas* is only applicable to "admitted" aliens, not aliens who have been deemed "inadmissible" like Petitioner.[1] While the Supreme Court in *Zadvydas* was specifically addressing the interests of "admitted" aliens held beyond the statutory removal period, the Ninth Circuit construed the holding of *Zadvydas* to cover "inadmissible" aliens as well. *Xi v. INS,* 298 F.3d 832 (9th Cir. 2002). As the court in *Xi* stated:

> Section 1231(a)(6) [ . . . ] does not draw any distinction between individuals who are removable on grounds of inadmissibility and those removable on grounds of deportability. On its face, the statute applies symmetrically to three classes of aliens: (1) those who are "inadmissible under section 1182;" (2) those who are deportable under sections 1227(a)(1)(C) (violation of nonimmigrant status or condition of entry), 1227(a)(2) (criminal offenses), or 1227(a)(4) (security and related grounds); or (3) those who are a risk to the community or unlikely to comply with the removal order. . . . Although *Zadvydas* concerned the second prong of the statute—relating to deportable aliens—the Court's ultimate holding [that the statute contains a six-month presumptively reasonable period of detention] addresses the statute as a whole
>
> . . . .

*Xi,* 298 F.3d at 835.

 Respondent's arguments that the Ninth Circuit in *Xi* misconstrued the holding of *Zadvydas* and that this Court should stay its decision on the instant motion until an en banc rehearing of *Xi* are both unavailing. *Xi* is binding precedent on this Court unless and until it is withdrawn by the Ninth Circuit or it is over-

---

**1.** Under 8 U.S.C. § 1182 aliens convicted of certain crimes prior to their arrival in the United States are deemed "inadmissible aliens" while under 8 U.S.C. § 1227 aliens who were already "admitted" into this country, but were subsequently convicted of certain crimes are categorized as "deportable aliens."

ruled by the Supreme Court.[2] *Yong v. INS,* 208 F.3d 1116, 1119, n. 2 (9th Cir. 2000)("[O]nce a federal circuit court issues a decision, the district courts within that circuit are bound to follow it and have no authority to await a ruling by the Supreme Court before applying the circuit court's decision as binding authority.") Therefore, this Court is bound by the Ninth Circuit's decision in *Xi,* that the holding of *Zadvydas* applies to "inadmissible" aliens as well.

■ The INS admits that after a year of trying it has been unable to secure travel papers from the Cuban government necessary to remove Petitioner from the United States. Because there is no removal agreement between the United States and Cuba,[3] and the government has proffered no evidence that such an agreement will likely be entered into in the near future, Petitioner has met his burden under *Zadvydas* of showing that there is "no significant likelihood of removal in the reasonably foreseeable future."

### 2. *Danger to the community exception*

Respondent argues that even if *Zadvydas* applies to "inadmissible" aliens, this decision nonetheless contains an exception which allows for the continuing detention of aliens who pose a danger to the community.[4] In *Zadvydas,* the Court stated that while it had allowed "preventative detention based on dangerousness," it only did so in instances where it was "limited to specially dangerous individuals and [was] subject to strong procedural protections." 533 U.S. at 690–91, 121 S.Ct. 2491 (citing *Kansas v. Hendricks,* 521 U.S. 346, 368, 117 S.Ct. 2072, 138 L.Ed.2d 501 (1997) and *United States v. Salerno,* 481 U.S. 739, 747, 750–752, 107 S.Ct. 2095, 95 L.Ed.2d 697 (1987)). The Court also stated that "[i]n cases in which preventive detention is of potentially indefinite duration, we have also demanded that the dangerousness rationale be accompanied by some other special circumstance, such as mental illness, that helps to create the danger." *Id.* at 691, 121 S.Ct. 2491.

In this case Respondent argues that continued detention is warranted because Petitioner "presents a special danger to the community due to his medically documented mental illness." Respondent's Return ("Return") at 2. Petitioner does not challenge the authority of the INS to detain deportable aliens who pose a danger to the community.[5] Rather, Petitioner

---

**2.** The Court notes that the Ninth Circuit denied the petition for an en banc rehearing of *Xi* and the Supreme Court, to date, has not granted a petition for certiorari.

**3.** *See,* Petitioner's Traverse ("Traverse"), Exhib. 1, Custody Review Worksheets at 2 ("No [t]ravel document application [to Cuba] was effected. No agreements have been entered into between the Cuban and U.S. [g]overnments to allow removal via deportation to Cuba at this time.").

**4.** The Court notes that the petitioner in *Zadvydas* had "a long criminal report, involving drug crimes, attempted robbery, attempted burglary, and theft." 533 U.S. at 684, 121 S.Ct. 2491. The other petitioner in the case, Mr. Ma, was being detained past the removal period because "in light of his former gang membership, the nature of his crime, and his planned participation in a prison hunger strike, [the INS] was 'unable to conclude that Mr. Ma would remain nonviolent.'" *Id.* at 685–686, 121 S.Ct. 2491. Nonetheless, the Court held that since there was no realistic chance that either would be repatriated to their native countries, both had to be released. Therefore, any "exception" for continued detention for "dangerousness" requires something more than merely a record of *past* violence or dangerous criminal activity.

**5.** The Supreme Court in *Zadvydas* summarized this framework as follows:

Related Immigration and Naturalization Service (INS) regulations add that the INS District Director will initially review the alien's records to decide whether further detention or release under supervision is

contends the INS reached the wrong result in Petitioner's case because the evidence that he is both specially dangerous and suffers from a mental illness which helps create this danger, was insufficient to support his continued detention under *Hendricks*.[6] Traverse at 12.

In conducting the initial 90–day review, deportation officer Dickerson stated that

he reviewed Petitioner's criminal history records as well as the fact that he had twice been determined to be mentally incompetent.[7] Officer Dickerson stated that on-going detention could be premised on the "continuing threat of violence" exception in *Zadvydas*. It is clear that this recommendation was based on his belief that Petitioner suffered from a mental condition that prevented him from being able to control his actions.[8] While this determi-

---

warranted after the 90–day removal period expires. 8 C.F.R. § 241.4(c)(1), (h), (k)(1)(i) (2001). If the decision is to detain, then an INS panel will review the matter further, at the expiration of a 3–month period or soon thereafter. § 241.4(k)(2)(ii). And the panel will decide, on the basis of records and a possible personal interview, between still further detention or release under supervision. § 241.4(i). In making this decision, the panel will consider, for example, the alien's disciplinary record, criminal record, mental health reports, evidence of rehabilitation, history of flight, prior immigration history, and favorable factors such as family ties. § 241.4(f). To authorize release, the panel must find that the alien is not likely to be violent, to pose a threat to the community, to flee if released, or to violate the conditions of release. § 241.4(e). And the alien must demonstrate "to the satisfaction of the Attorney General" that he will pose no danger or risk of flight. § 241.4(d)(1). If the panel decides against release, it must review the matter again within a year, and can review it earlier if conditions change. §§ 241.4(k)(2)(iii), (v).
533 U.S. at 683, 121 S.Ct. 2491.

**6.** In *Hendricks*, the Supreme Court upheld the constitutionality of a state civil statute which provided for the confinement of sexually violent predators. 521 U.S. 346, 117 S.Ct. 2072, 138 L.Ed.2d 501 (1997). The Court agrees with Petitioner that the decision in *Hendricks* was premised on the fact that the statute required a determination of "future dangerousness" linked to a finding of mental illness that "makes it difficult, if not impossible, for the person to control his dangerous behavior." 521 U.S. at 358, 117 S.Ct. 2072.

**7.** These records establish the following facts: Subsequent to his arrival in Miami, Florida on August 23, 1995, Petitioner was paroled into the United States by the INS. Between

the Fall of 1996 and the Fall of 1999, Petitioner was arrested five times for, among other things, displaying a firearm in public, possession of a controlled substance with intent to distribute, battery, and threatening a witness. On September 22, 1999, he was convicted of violating a restraining order related to domestic violence, a misdemeanor, and was placed on probation. On October 19, 1999, Petitioner was charged with four further violations of this restraining order. On December 6, 1999, the state court held a mental competency hearing at which Petitioner was deemed to be "not mentally competent" and was committed to Patton State Hospital for a term of three years. Although his exact date of release is not disclosed in these records, Petitioner was charged with a further violation of the restraining order on May 4, 2000. On July 7, 2000 the court held a competency hearing and determined that Petitioner was competent to stand trial. On July 25, 2000, Petitioner pled guilty to one count of violating a temporary restraining order with a prior and one count of making a terrorist threat. However, on December 28, 2000, he was sent to Patton State Hospital for mental diagnosis and was again determined to be not mentally competent. On May 17, 2001, he was sentenced for the prior conviction and received two-year state prison terms for each count, to be served concurrently. On May 22, 2001, he was processed into state prison. On or about May 29, 2001, he was released into INS custody.

**8.** "He appears to provide such a threat based on his criminal history, and upon notices that he has twice been declared to be mentally incompetent following acts of violence against his victim, and after he threatened to kill her if she testified against him to Police. He has demonstrated that he holds no respect for Restraining Orders issued by the Superior

nation and recommendation was based on "Psychiatric information available at this time," the officer stated that Petitioner "is pending an in-depth analysis by a Psychiatrist at my request, specifically to attempt to determine if he provides a valid threat of violence to the community if he is released from Immigration Custody at this time" and should not be released until "he is determined through mental health examination to not provide a substantive threat to anyone upon his release." This recommendation was made on November 5, 2001 and adopted by the INS District Director on November 7, 2001. There is no indication in the records before the Court, that the recommended psychiatric evaluation to determine on-going dangerousness ever took place.

Petitioner contends that this determination was insufficient to uphold his potentially indefinite detention under *Hendricks* because 1) Officer Dickerson is not properly trained to make such mental health evaluations and 2) Petitioner's current medical and psychological documents indicated that he is "stable" and not a threat.

In analyzing this matter it is necessary to determine who bears the burden of proof regarding a detainee's dangerousness. While the INS regulations state that it is the detainee's burden to demonstrate to the Panel that if released he will pose no danger to the community, this only occurs *after* the District Director has made the initial determination that the detainee does pose such a danger. *See,* 8 C.F.R. §§ 241.4(d)(1), (c)(1). In *Foucha v. Louisiana,* 504 U.S. 71, 80–82, 112 S.Ct. 1780, 118 L.Ed.2d 437 (1992)(internal citations omitted), the Supreme Court held that a state seeking to confine a mentally ill person must prove "by clear and convincing evidence that the individual is mentally ill and dangerous." In *Hendricks,* however,

the Court indicated that a higher standard was required. The statute at issue in *Hendricks* required an initial determination by a court that there was "probable cause" to believe that the person could be defined as a "sexually violent predator." 521 U.S. at 352, 117 S.Ct. 2072. If such cause was found, the person was transferred to a secure facility for "professional evaluation." *Id.* After this evaluation, a trial would be held to determine "beyond a reasonable doubt whether the individual was a sexually violent predator." *Id.* at 352–353, 117 S.Ct. 2072.

■ While the Court in these cases was ostensibly determining the constitutional rights of "citizens" to be free from confinement, rather than "aliens" facing deportation, the Court in *Zadvydas* specifically referenced both of these cases in discussing the indefinite confinement of deportable aliens. Here Petitioner was not accorded a hearing for the determination as to whether he should continue to be detained as a mentally ill removable alien who is dangerous. Because the Court interprets *Zadvydas* as requiring such a hearing for the continued detention of removable aliens considered to be a danger to the community, the Court concludes that Petitioner's Constitutional due process rights were violated. Therefore, the INS must conduct an individualized hearing to determine if Petitioner currently poses a danger to the community sufficient enough to warrant his continued detention.

The parties have not briefed the issue of what type of hearing is appropriate to determine if Petitioner is a danger to the community, the appropriate burden of proof at such a hearing, or whether the INS already has a specific procedure in place for such a hearing. Therefore, the Court looks to Supreme Court precedence for guidance. In doing so the Court inter-

---

Court Judge in his cases. It is noted that to date he has had only one victim, and appar-

ently is fixated upon her as his victim of choice." Traverse, Exhib. 1 at 7.

prets *Zadvydas* as requiring that the government bear the burden of establishing by clear and convincing evidence that Petitioner poses a risk to the community sufficient to justify his continued detention. In *Zadvydas*, the Court specifically mentioned that in *Salerno* it upheld the detention procedure at issue there because, among other things, it contained a "requirement of proof of dangerousness by clear and convincing evidence." 533 U.S. at 691, 121 S.Ct. 2491; *Salerno* at 750, 107 S.Ct. 2095 ("In a full-blown adversary hearing, the Government must convince a neutral decisionmaker by clear and convincing evidence that no conditions of release can reasonably assure the safety of the community or any person."). The Court's citation to *Foucha v. Louisiana* is further support for the position that the burden of persuasion is on the government, not the petitioner. 533 U.S. at 691, 121 S.Ct. 2491 (citing *Foucha v. Louisiana*, 504 U.S. 71, 81–83, 112 S.Ct. 1780, 118 L.Ed.2d 437 (1992)(striking down insanity-related detention system that placed burden on detainee to prove non-dangerousness)).

The Court in *Zadvydas* also highlighted the importance of avoiding "preventative detention ... of potentially indefinite duration." 533 U.S. at 691, 121 S.Ct. 2491. In order to prevent such constitutionally suspect "permanent" civil confinement, the Court required strong procedural protections. *Id.* (citing *Salerno* at 747, 107 S.Ct. 2095 (noting positively that the "maximum length of pretrial detention is limited" by "stringent" requirements)). In order to prevent the statute at issue in *Zadvydas* from foundering in constitutionally troubling waters,[9] the Court found six months to be a presumptively reasonable period for post-removal order detentions. *Id.* at

701, 121 S.Ct. 2491. By analogy, this Court finds that detentions based on danger to the community are presumptively valid only for a period of six months, after which a new evaluation needs to be made to continue detention. Therefore, if the INS continues to detain Petitioner based on his danger to the community, it must re-evaluate this decision at least every six months.

## IV. CONCLUSION

For the aforementioned reasons, the Petition for writ of habeas corpus [1–1] is GRANTED in part and DENIED in part. The INS is ordered to schedule a hearing within 30 days of this Order being stamped "filed" to determine if Petitioner currently poses a danger to the community if he were to be released. If the INS decides to continue the Petitioner's detention on this basis, it shall review this decision at least every six months. The Court will hold a status conference on this matter on May 13, 2003, at 11:30 p.m.

**IT IS SO ORDERED.**

---

9. As the Court stated, the "serious constitutional problem arising out of a statute that, in these circumstances, permits an indefinite, perhaps permanent, deprivation of human liberty without any such protection, is obvious." 533 U.S. at 692, 121 S.Ct. 2491.